IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2021 Session

## STATE OF TENNESSEE v. DEMETRIOUS TOMMY LEE

**Appeal from the Criminal Court for Davidson County**
**No. 2019-C-1612    Jennifer L. Smith, Judge**
_____

### No. M2020-00914-CCA-R3-CD
_____

In 2018, a Davidson County Grand Jury indicted the Defendant, Demetrious Tommy Lee, for attempted first degree murder, aggravated kidnapping, reckless endangerment, evading arrest while operating a motor vehicle, and domestic assault. In 2019, a superseding indictment was returned, elevating the Defendant's kidnapping charge to especially aggravated kidnapping and adding a charge for employment of a firearm during the commission of or attempt to commit a dangerous felony but keeping all other charges the same. One week prior to trial, the Defendant filed a motion for a continuance, which the trial court denied following a hearing. At trial, the jury found the Defendant guilty of the lesser included offense of attempted second degree murder as well as the charged offenses of especially aggravated kidnapping and employment of a firearm but found the Defendant not guilty of evading arrest. The charges of reckless endangerment and domestic assault were dismissed. Thereafter, the trial court imposed an effective eighteen-year sentence to be served at 100% for these convictions. On appeal, the Defendant argues: (1) the trial court erred in denying his motion to continue his trial after the State superseded the indictment and presented him with additional discovery shortly before trial; (2) the trial court erred in denying his motion to exclude evidence that violated State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999); (3) the trial court committed plain error in not requiring the State to make an election of offenses with regard to the especially aggravated kidnapping count; and (4) the evidence is insufficient to sustain his convictions for attempted second degree murder and especially aggravated kidnapping. We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Manuel B. Russ (on appeal) and Joseph Morrissey (at trial), Nashville, Tennessee, for the Defendant-Appellant, Demetrious Tommy Lee.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Doug Thurman and David Jones, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

On June 18, 2018, a Davidson County Grand Jury indicted the Defendant for attempted first degree murder, aggravated kidnapping, reckless endangerment, evading arrest while operating a motor vehicle, and domestic assault. On July 26, 2019, a superseding indictment was returned, charging the Defendant with attempted first degree murder, especially aggravated kidnapping, employment of a firearm during the commission of or attempt to commit a dangerous felony, reckless endangerment, evading arrest while operating a motor vehicle, and domestic assault. The Defendant was formally arraigned on the superseding indictment on August 9, 2019.

**Motion for a Continuance.** On August 12, 2019, the Defendant filed a motion to continue his trial, arguing: (1) his original case "was superseded on August 9[,] 2019"[1] with a new indictment that added the employment of a firearm charge and enhanced the aggravated kidnapping charge to especially aggravated kidnapping; (2) on August 9, 2019, the State provided him with fifteen pages of motions in limine that it intended to argue prior to trial in ten days; and (3) the State provided additional discovery responses on July 26, 2019, containing supplemental reports and Jencks material and on July 30, 2019, containing additional medical records, which could necessitate evidentiary motions to ensure a fair trial. The State filed a lengthy response to this motion, asserting that it had provided written notice to the defense on June 19, 2019, regarding the impending superseding indictment and that there was nothing in the supplemental discovery responses that would justify a continuance.

At the August 14, 2019 hearing, defense counsel reiterated that it filed its motion for a continuance in light of the Defendant's August 9, 2019 arraignment on the superseding indictment and the State's recent supplementary discovery responses. He stated that while the State had informed him at the end of June that they were going to file a superseding indictment, the Defendant did not get arraigned on this superseding indictment until ten days before the Defendant's scheduled trial. He also noted that the State's supplemental discovery responses on July 26, 2019 and July 30, 2019, included information taken from the Defendant's cell phone, which might necessitate an evidentiary motion because this evidence had no probative value. Defense counsel added that this was

---

[1] The record shows that the superseding indictment was returned on July 26, 2019, and that the Defendant was arraigned on this indictment on August 9, 2019.

"the first trial setting of this case" and that the State would be "hard-pressed to show any prejudice to their victim or to their witnesses[.]"

The State countered that it had given defense counsel written notice on June 19, 2019, that there would be a superseding indictment and had included in this notice the exact charges that would be included in the superseding indictment. The State explained the delay in obtaining this superseding indictment by asserting that there were not many court dates in July and that this case had come up when the Grand Jury was transitioning from another division. As to the addition of the firearm charge, the State argued that it was obvious at the preliminary hearing and at the bond revocation hearing that there was a gun involved in this case and noted that there was a video recording of the Defendant holding a gun as he dragged the victim through the parking lot by her hair. The State asserted, "I would like to know exactly what it is he cannot prepare for in this case that is a year and a half old and why we would have to continue this case."

Defense counsel replied that the State could have superseded the indictment in December, but they failed to do so, and consequently the Defendant was not arraigned on the superseding indictment until ten days prior to trial. He added that he was only asking for "a couple of months" to ensure "[his] client [was] provided the representation that he is guaranteed under Strickland [v. Washington, 466 U.S. 668 (1984)." The State then insisted that this was "not a complex case," that the defense had received all discovery to which he was entitled, and that the defense had never taken advantage of their "open file policy."

At the conclusion of the hearing, the trial court denied the motion, stating:

This case has been set for trial. There ha[ve] been issues throughout the case with [the Defendant's] compliance with the terms of his release. And in fact, the last time that he was here on a violation on the terms of his release, one of the assurances that [the Defendant] had was that he would be going to trial soon and [would] be relieved of the conditions of his release one way or the other.

I haven't seen any indication that there are any new facts that have been presented as a result of the superseding indictment. The defense was aware that the superseding indictment was on the way in plenty of time to prepare for that. And so based on that, I'm going to deny the motion for [a] continuance, and we will go forward.

Thereafter, defense counsel stated that he would be filing "a number of evidentiary motions in quick succession" by the end of the week and that depending on the rulings on those motions, "[W]e can see where we go." However, the appellate record does not include any motions filed between the conclusion of this hearing and the Defendant's trial.

**Trial.** At the Defendant's trial, which took place on August 19, 2019, and August 20, 2019, only four counts charging him with attempted first degree murder, especially aggravated kidnapping, employment of a firearm, and evading arrest while operating a motor vehicle were submitted to the jury.

Ryan Croft testified that on March 26, 2018, at around 5:00 p.m., he was preparing dinner at his apartment when he heard the victim scream. When he looked over his balcony, he saw a man and the female victim fighting in the parking lot below and then heard a gunshot. Croft returned to his apartment but continued to watch what was happening through a window while his wife called 9-1-1. He also filmed the altercation with his iPad.

Croft saw the Defendant drag the victim through the parking lot by her clothes and then saw the victim manage to take the Defendant's gun. He said the Defendant and the victim both fell to the ground, and then the Defendant recovered his gun and dragged the victim by her hair toward a car in the center of the parking lot. The Defendant tried to force the victim into this car, and the victim slammed the door shut as she screamed for help. In an effort to help her, Croft stopped recording and pressed the panic button on the keys to his wife's vehicle, which was parked in the parking lot, before continuing to record the altercation. He noted that there were only five or six seconds between his two recordings. Croft said the Defendant then forced the victim into the vehicle, closed the door, stepped away, and then fired a gunshot into the passenger window from a distance of only seven or eight feet away before getting into the car and quickly driving away. Croft acknowledged that he never saw the Defendant's gun aimed at the victim until the Defendant shot into the passenger window of the car. He said the police arrived two to three minutes after the Defendant left.

Croft's video recordings of the incident were played for the jury. The first recording showed the victim trying to escape; the Defendant and the victim wrestling over a gun; the Defendant, who was more than twice the weight of victim, easily gaining control over the victim and the gun; and the Defendant holding the victim down on the ground before dragging her across the parking lot. The second recording showed the Defendant dragging the victim by her hair over to a car and the victim slamming the car's passenger door shut before the Defendant opened it and pushed her into the passenger seat as the victim screamed, "Somebody help me!"

- 4 -

Skylar Peterson, the victim, testified that she and the Defendant dated for a few months until she ended their relationship in November or December 2017. She noted that the Defendant did not take their break-up well, even though she had tried to remain friends with him.

The victim stated that on March 26, 2018, she left her apartment around 5:00 p.m. to pick up her daughter. At the time, she did not see the Defendant or the Defendant's car in the parking lot. As she began to reverse out of her parking spot, her door suddenly flew open, and the Defendant held a gun and threatened to kill her. The victim immediately jumped out of her car and attempted to run away as she screamed for help. The Defendant grabbed her and snatched her cell phone out of her hands. As she struggled to free herself, she heard a gunshot and felt her knee burning. At the time, the victim thought she had been shot, although she only sustained broken skin to her knee, and believed that she would probably be shot again. The victim noted that she was five foot one inches tall and 120 pounds while the Defendant was approximately six foot two or three inches tall and 250 pounds.

The victim said the Defendant dragged her back toward her car, and as she tried to resist, they both fell to the ground, and the Defendant dropped his gun. She tried to grab it, but the Defendant recovered it and told her to get up or he would shoot her. When she refused to comply, the Defendant grabbed her shirt and dragged her toward her car. When her outer shirt ripped, he grabbed her by her hair as she tried to escape. The victim said that the Defendant, while still holding the gun, tried to force her into the passenger seat of her car, although she attempted to close the car door so she would not have to get in. The Defendant then got her into the passenger seat by threatening to shoot her in the head. When the victim opened the glove compartment to grab her own firearm, a nine millimeter handgun that she legally owned, the Defendant shot her in the right shoulder, shattering the car's window. The victim asserted that she never had her gun in her hand when the Defendant shot her in the shoulder. After shooting her, the Defendant closed her car door, got into the driver's seat of her vehicle, and sped away from the scene. The victim stated that the Defendant never made any attempts to render aid to her. She said that after being shot in the shoulder, she was in excruciating pain, lost a substantial amount of blood, which was all over her clothes, had difficulty breathing, and believed she was dying.

The victim said that as the Defendant drove away from the parking lot, he told her that this was her fault and that she should have stayed with him. He also told her many times that she would die, and she believed him. In order to escape, the victim told the Defendant that she wanted to work things out with him and asked him to take her to a hospital. The Defendant eventually took her to the Southern Hills Hospital, but as they approached the emergency room, he told her that she would not be going there because there was a police officer present, and he refused to go to jail. As the Defendant pulled out

of the parking lot, he told her not to jump out of the car. When the Defendant left the hospital parking lot, an unmarked police car activated its blue lights. A second police officer threw out a spike strip to stop the Defendant, but the Defendant avoided it. Thereafter, the Defendant began driving fast and weaving in and out of traffic and told the victim that she needed to "get ready to die" because he was not going to jail."

The victim said the Defendant entered Interstate 24. He took the Haywood Lane exit just as her car ran out of gas. When the Defendant saw the police, he exited the vehicle and ran without trying to assist the victim. A few moments later, the police or the paramedics arrived, and the victim was taken to the hospital. Evidence was presented showing that the Defendant drove 8.7 miles with the victim in the car. The police later informed the victim that a gun, other than her nine millimeter, had been found in the floorboard of her car.

The victim stated that the gunshot to her shoulder shattered her humerus bone. She explained that this bullet passed into her chest, hit her lung, and became permanently lodged in her chest. As a result of this injury, she lost 70% of her arm mobility, which required surgery and physical therapy. By the time of the Defendant's trial, the victim was unable to raise her arm over her head. Because of this injury, the victim said she missed approximately seven months of work and had permanent scarring, which she showed to the jury. Photographs of the injuries to her shoulder and knee were shown to the jury. The victim identified herself and the Defendant in the video recordings made of the incident. She noted that these video recordings did not depict the gunshot wound to her knee or the gunshot wound to her shoulder.

Officer Michael Russell with the Metro Nashville Police Department testified that when he received notice of the shooting, he drove by Southern Hills Hospital to see if anyone had been dropped off with gunshot wounds. When he arrived, he saw a car matching the description of the victim's black Challenger pulling into the hospital's parking lot. Officer Russell notified his unit before the Defendant saw him and left the area at a high rate of speed. Another officer set up spike strips at the entryway, but the Defendant managed to avoid them. By the time Officer Russell reached the road, he could not see where the Defendant had gone.

Officer Jeffrey Livingston testified that he and his partner observed the victim's vehicle exiting Interstate 24 onto Haywood Lane shortly after receiving notice of this crime. As they got close, they saw the victim's vehicle stopped on the exit ramp, and the Defendant exited the car and began to run. The Defendant ran approximately twenty or thirty yards before the officers caught up to him and placed him under arrest. Upon being taken into custody, the Defendant stated that his gun was either in the victim's car or had been thrown out the window of the vehicle.

Officer Andrew Brazee testified that he responded to the victim's apartment complex after hearing the call that shots had been fired there. He found two empty shell casings and one live round in the apartment parking lot. Several witnesses provided information concerning the crime. Officer Brazee observed what appeared to be a shot fired into the concrete at the far end of the crime scene near the exit of the complex. He acknowledged that four to five witnesses had iPad or cell phone video recordings of the incident, and he included the names of these witnesses and their contact information in his incident report, which he turned over to the lead detective. He instructed these witnesses to save their video recordings of the incident because they would be evidence.

Detective Miguel Garcia testified that he retrieved a loaded handgun from the victim's car at the service shop where it was being repaired. He said the gun was between the driver's seat and the center console. This gun, a .40-caliber Glock 22 with extended magazine, was admitted into evidence.

Detective Terrance McBride testified that he interviewed three witnesses at the victim's apartment complex, including Ryan Croft, and he turned over Croft's two video recordings to the district attorney's office. He also interviewed Croft's neighbor, who had only an audio recording of the incident. He stated that because the neighbor was unable to provide a copy of the audio recording to him, that audio recording was never turned over to the property room. Detective McBride offered that because he records all of his interviews with witnesses, part of the neighbor's audio recording might have been captured during the neighbor's recorded interview, which he turned into the property room as evidence. Detective McBride stated that Officer Brazee included the names of three witnesses in his report and that Detective McBride interviewed all three of these witnesses.

The Defendant, Demetrious Tommy Lee, testified that he had gone to the victim's apartment on the day of the shooting to collect his belongings. He said he was about to send the victim a text message to let her know he was there to get his things when he saw the victim getting into her car. He walked to her passenger door, opened it, and when he told her he was here to get his belongings, the victim took off running. The Defendant said that as he ran behind the victim, his gun fell out of his pocket, hit the ground, and discharged. He said that when the gun went off, the victim had already stopped running. The Defendant said he had the victim's shirt in his hand and the gun was on the ground, so he picked the gun up. He then told the victim to "come on" and to give him his belongings, and the victim asked for a moment to catch her breath. The Defendant returned the gun to his pocket, and as they were walking, the victim got his gun out of his pocket.

The Defendant said that at that point, he and the victim "tussled, fell to the ground" and he got the gun out of the victim's hand. The Defendant admitted he got on top of the

- 7 -

victim but denied holding the victim down and denied threatening to shoot her. He said that when they got back to the victim's car, the door was open, and she shut it. Then he opened the door, and the victim got into the passenger seat and pulled the door toward her, but it was still ajar. He said the victim "popped her glove compartment box, got her gun, turned," and he shot the victim in the arm. After firing this shot, the Defendant "ran around" to the driver's side, got into the victim's car, and "sped off." He also put his gun between the seat and the door console. As they left, he asked the victim what she needed him to do, and she told him to pull her shirt down and to cover her up. The Defendant claimed that he headed to the hospital, and the victim gave him directions there. As they approached the hospital, he saw an unmarked police car, which scared him, so he drove away at a high rate of speed. The Defendant said that he was headed to another hospital when the victim's car ran out of gas, and he attempted to run away before being taken into custody.

The Defendant acknowledged that the victim never invited him to her apartment on March 26, 2018. He admitted having a .40-caliber gun in his pocket but denied brandishing this gun when he initially opened the passenger door to the victim's car. He claimed he did not have the gun in his hand when the victim jumped out of her car and ran away. The Defendant admitted that he later pulled the victim's shirt, which was how it got ripped. He also acknowledged that after the victim got his gun, they "tussled" to the ground and he got on top of the victim, recovered his gun, and began dragging the victim back to her vehicle. He denied telling the victim that if she did not get up, he would shoot her. He claimed that the victim got up and voluntarily walked back to her vehicle, even though he had one hand on her shirt and his .40-caliber gun in his other hand. When he was asked about dragging the victim by her hair, the Defendant claimed that he "thought [he] still had her shirt in [his] hand." He admitted that he was standing very close to the car when he shot the victim but asserted that he was aiming at her shoulder when he fired. The Defendant denied telling the victim that the shooting was her fault or that she was going to die. He claimed that he did not see the victim bleeding and that the victim "could have" gotten out of the car at the hospital. The Defendant said that he never saw blue lights behind him at the hospital and that he never saw the spike strip that the police put out when he left the hospital parking lot. Although the Defendant said he was taking the victim to another hospital, he knew of no hospitals in the area of the Haywood Lane exit he took before the car ran out of gas. He denied seeing any uniformed officers or blue lights behind him before his arrest, even though he knew a police officer was behind him.

At the conclusion of trial, the jury convicted the Defendant of the lesser included offense of attempted second degree murder as well as the charge offenses of especially aggravated kidnapping and employing a weapon during the commission of or attempt to commit a dangerous felony. The jury found the Defendant not guilty of evading arrest. The charges for reckless endangerment and domestic assault were dismissed. Following a

sentencing hearing, the trial court imposed an effective sentence of eighteen years to be served at 100% for these convictions. The Defendant timely filed a motion for new trial, arguing in pertinent part, that the trial court erred in allowing the State to supersede the original indictment less than one month before trial and more than eighteen months after the initial prosecution of the Defendant, which violated the Defendant's due process rights and "could be perceived as prosecutorial vindictiveness"; that the trial court erred in failing to grant the Defendant's motion to continue trial, given that the superseding indictment greatly enhanced the level of the offense and the State provided extensive discovery responses just prior to trial; that the trial court erred in failing to grant a mistrial after the disclosure that there were additional videos, containing possibly exculpatory evidence, that the State recovered but failed to preserve and provide to the Defendant in violation of State v. Ferguson and State v. Merriman, 410 S.W.3d 779 (Tenn. 2013); and that that the evidence was insufficient to sustain his conviction for attempted second degree murder. When the trial court denied the motion for new trial, the Defendant filed a timely notice of appeal.

## ANALYSIS

**I. Motion to Continue.** The Defendant argues that the trial court erred in denying his motion to continue the trial after the State issued a superseding indictment ten days prior to trial and presented him with additional discovery approximately three weeks prior to trial. The State responds that the trial court did not abuse its discretion in denying the motion to continue. It contends that two months prior to trial, the State provided written notice to the Defendant of the impending superseding indictment, which added the employment of a firearm charge and changed the aggravated kidnapping charge to especially aggravated kidnapping. It claims that these changes to the Defendant's charges did not substantially alter his defense. It also asserts that the Defendant waived review of his claim that he was entitled to a continuance due to a discovery violation because he failed to include his motion for discovery in the appellate record and failed to cite to the record regarding an alleged supplemental report regarding his cellular telephone that does not appear to have been admitted as evidence at trial. We conclude that the trial court did not abuse its discretion in denying the continuance.

A trial court's denial of a continuance will be reversed only if it appears that the trial court abused its discretion to the prejudice of the defendant. State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004)). "'An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted.'" State v. Schmeiderer, 319 S.W.3d 607, 617 (Tenn. 2010) (quoting State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)). The party requesting the continuance has the burden of showing that the court's action was prejudicial. State v. Goodman, 643 S.W.2d 375, 378

(Tenn. Crim. App. 1982). "The only test is whether the defendant has been deprived of his rights and an injustice done." Id. A defendant who claims that a denial of a continuance constitutes a denial of Sixth Amendment or due process rights must also establish actual prejudice. Schmeiderer, 319 S.W.3d at 617 (citing Odom, 137 S.W.3d at 589).

First, the Defendant argues that the trial court erred in denying the motion for a continuance because his trial took place less than fourteen days after he was arraigned on the superseding indictment. He insists that the trial court denied his motion to continue by erroneously relying on Tennessee Rule of Criminal Procedure 7(b)(2), which applies to amendments of indictments rather than superseding indictments and permits "such an amendment if no additional or different offense is charged and no substantial right of the defendant is prejudiced." Instead, the Defendant asserts that the trial court should have applied Code section 40-14-105 because the State sought a new, superseding indictment that increased the severity of some of his charges and added new charges. The Defendant also claims that the brief period of time between his arraignment on the superseding indictment and his trial violated his right to effective assistance of counsel and amounted to a non-structural constitutional error that requires reversal. See Malone v. State, 707 S.W.2d 541, 543 (Tenn. Crim. App. 1985); Tommy Griffin v. State, 1989 WL 60519, at *1 (Tenn. Crim. App. June 7, 1989). He also claims that "the State's tactical decision to increase his charges at the last possible minute" prejudiced him by violating his right to a fair trial. The Defendant additionally argues that the State was motivated by prosecutorial vindictiveness when it increased his charges after he decided to exercise his right to a trial. See State v. Phipps, 959 S.W.2d 538, 540 (Tenn. 1997).

Tennessee Code Annotated section 40-14-105 states, "Every person accused of any crime or misdemeanor whatsoever shall be entitled to fourteen (14) full days, Sundays and legal holidays excluded, after arrest and the return of the indictment or presentment before being tried for the offense." Tenn. Code Ann. § 40-14-105 (emphases added). With respect to this statute, this court clarified that "the legislature intended that the delay between indictment and trial apply only where the indictment or presentment and arrest occur substantially at the same time[.]" State v. Brown, 795 S.W.2d 689, 693 (Tenn. Crim. App. 1990) (citing Hood v. State, 216 S.W.2d 14 (Tenn. 1948); Dukes v. State, 578 S.W.2d 659 (Tenn. Crim. App. 1978)); see also Moultrie v. State, 584 S.W.2d 217, 219 (Tenn. Crim. App. 1978). Here, the record clearly shows that the return of the superseding indictment and the Defendant's arrest did not occur substantially at the same time, as the Defendant was on bond from the first indictment when he was arraigned on the superseding indictment.

In any case, the Defendant is not entitled to relief under the plain language of Code section 40-14-105. See State v. Welch, 595 S.W.3d 615, 623-24 (Tenn. 2020) ("When the text of a statute is clear and unambiguous, we need not look beyond the plain language of

- 10 -

the statute to ascertain its meaning."). Although the Defendant erroneously focuses on the date that he was arraigned on the superseding indictment, the critical date for the purposes of Code section 40-14-105 is the date the superseding indictment was returned. Here, the superseding indictment was returned by the grand jury on July 26, 2019, and the Defendant's trial began on August 19, 2019. Because there were nineteen days between the return of the superseding indictment and the start of the Defendant's trial, the State fully complied with Code section 40-14-105. Accordingly, the Defendant is not entitled to relief pursuant to this code section.

Moreover, the Defendant has failed to show any resulting prejudice from going to trial nineteen days after the return of the superseding indictment. The record shows that the initial indictment was issued fourteen months prior to the Defendant's trial and that the underlying facts in the initial and superseding indictments were the same. It is undisputed that the State gave defense counsel written notice that there would be a superseding indictment and identified the exact charges that would be included in the superseding indictment on June 19, 2019, two full months prior to the Defendant's trial. The record is devoid of any evidence showing that the Defendant was denied adequate assistance of counsel or that his rights to a fair trial and due process were violated. Because the Defendant has failed to establish that he was prejudiced by the trial court's denial of his motion to continue, he is not entitled to relief on this basis.

As to the Defendant's claim that the State was motivated by prosecutorial vindictiveness in obtaining the superseding indictment after he exercised his right to a trial, we also conclude that he is not entitled to relief. "[T]he State may obtain a superseding indictment at any time prior to trial without dismissing the pending indictment and may then select the indictment under which to proceed at trial." State v. Harris, 33 S.W.3d 767, 771 (Tenn. 2000). "Although the State may not bring a superseding indictment to harass or intimidate the accused, a legitimate decision to bring a superseding indictment is uniquely within the State's authority." Id. (footnote omitted). The Defendant has waived any claim of prosecutorial vindictiveness by failing to raise this issue prior to trial. See Tenn. R. Crim. P. 12(b)(2)(A); 12(f)(1); Cf. Fed. R. Crim. P. 12(b)(3)(A)(iv). In any case, we note that in order for this court to find prosecutorial vindictiveness in the pre-trial context, the Defendant must prove actual vindictiveness. See United States v. Goodwin, 457 U.S. 368, 384 (1982). Here, the Defendant has provided absolutely no proof that the superseding indictment was the result of prosecutorial vindictiveness. Therefore, the Defendant is not entitled to relief on this basis.

Finally, the Defendant argues that the trial court erred in denying his continuance based on the State's late-filed discovery, which was given to him three weeks prior to trial. He contends that pursuant to Tennessee Rule of Criminal Procedure 16(a)(1)(F), the State was obligated to provide him with the results of the search of his phone and the additional

police reports that were not disclosed until late July 2019, three weeks prior to trial. The Defendant asserts that although his counsel asked for a continuance pursuant to Rule 16(d)(2)(B), based in part on the late-filed discovery, the trial court elected not to impose a remedy of a continuance and tried the Defendant ten days later on August 19, 2019. He claims the error in denying the continuance forced his attorney to go to trial inadequately prepared and led to an unfair trial.

We conclude that the Defendant has waived this issue for failing to include his motion for discovery and the substance of the State's late discovery responses in the record. The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "Where . . . the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which a party relies, this Court is precluded from considering the issue." State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1998) (citing State v. Groseclose, 615 S.W.2d 142, 147 (Tenn. 1981); State v. Jones, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981)). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). In any case, the Defendant has failed to show how the State's delivery of these supplemental discovery disclosures shortly before trial hindered his trial preparation and defense. See State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992). Because the Defendant has failed to show that he was denied a fair trial or that a different result would have followed head the continuance been granted, he is not entitled to relief.

**II.  Motion to Exclude Evidence.**  The Defendant also argues that the trial court erred in denying his "motion to exclude" evidence based upon the State's failure to preserve an unidentified witness's audio recording of the incident. This argument is made pursuant to State v. Ferguson. Specifically, the Defendant claims that because he was never given an audio recording from this witness during discovery, he was unable to use it to corroborate his testimony at trial or to cast doubt on the victim's testimony and the State's evidence. In response, the State initially claims that the Defendant waived review of this issue by failing to provide a transcript from the motion to exclude or the ruling on this motion and by failing to provide citations to the record. Moreover, the State argues that to the extent the Defendant claims the trial court erred in denying his mistrial due to this alleged Ferguson violation, the trial court properly held that the State did not have a duty to produce a video recording that was in the possession of a private person and that there was no fundamental unfairness to the Defendant because the State presented clear audio and video footage of the incident from Ryan Croft at trial. The State asserts that because it did not have a duty to preserve evidence not in its possession, the Defendant has failed

to establish any bad faith and is not entitled to relief. We conclude that the trial court did not err in denying the motion for an mistrial.

Initially, we recognize that the Defendant risked waiving this issue by mischaracterizing it as a motion to exclude, rather than a motion for a mistrial, and by failing to include appropriate references to the record. See Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7). However, because the record does show that the defense moved for a mistrial based the State's failure to preserve this audio recording, we will consider whether the trial court erred in denying this motion for a mistrial.

At trial, Detective McBride testified that he interviewed all three of the witnesses in Officer Brazee's report, including Ryan Croft, and he turned over Croft's video recordings to the district attorney's office. Detective McBride said he also interviewed Croft's neighbor, who had only an audio recording of the incident. He explained that because the neighbor was unable to provide a copy of the audio recording to him, he never turned the neighbor's audio recording in to the property room. Detective McBride offered that because he records all of his interviews with witnesses, part of this neighbor's audio recording might have been captured during the neighbor's recorded interview, which he did turn into the property room as evidence.

Later at trial, defense counsel moved for a mistrial, arguing that the State had a duty to turn over the neighbor's audio recording under Brady v. Maryland, 373 U.S. 83 (1963), and failed to do so. He asserted that Officer Brazee had testified that there were four videos of this incident, and Detective McBride said that there were only three videos but that only the two video recordings provided by Ryan Croft were "good" because the third video provided by the neighbor only had audio. The State countered that the audio recording was never in the State's possession and that Detective McBride did not have a duty to collect it because it was not exculpatory. The trial court denied the motion for a mistrial, stating, "[T]he evidence before the court shows that the [audio] recording that the defendant is speaking of was never actually in the custody of the State.

Although the Defendant cited Brady when he moved for a mistrial, his argument on appeal focuses on Ferguson. Cf. State v. Schiefelbein, 230 S.W.3d 88, 129 (Tenn. Crim. App. 2007) (citing State v. Adkisson, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994); Tenn. R. Evid. 103(a)(1)). In any event, we conclude that the trial court did not abuse its discretion in denying the motion for a mistrial.

The decision to grant or deny a mistrial rests within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. State v. Nash, 294 S.W.3d 541, 546 (Tenn. 2009); State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). A trial court should declare a mistrial "only upon a showing of manifest necessity." Robinson, 146

S.W.3d at 494 (citing State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" Saylor, 117 S.W.3d at 250 (quoting State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "'The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict.'" State v. Reid, 164 S.W.3d 286, 341-42 (Tenn. 2005) (quoting State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). The party seeking a mistrial has the burden of establishing the necessity for a mistrial. Id. at 342 (citing Williams, 929 S.W.2d at 388).

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution guarantee every defendant the right to a fair trial. In order to safeguard this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence material either to guilt or to punishment. Brady, 373 U.S. at 87.

Ferguson governs claims regarding the State's duty to preserve potentially exculpatory evidence. 2 S.W.3d at 915-17. The proper inquiry is "'[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair.'" Merriman, 410 S.W.3d at 785 (alteration in original) (quoting Ferguson, 2 S.W.3d at 914). When a defendant makes a Ferguson claim, the trial court first must "determine whether the State had a duty to preserve the evidence." Id. The State has a general duty to preserve all evidence subject to discovery and inspection under Tennessee Rule of Criminal Procedure 16, and other applicable law, including Brady. Id. (citing Ferguson, 2 S.W.3d at 917). "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" Id. (quoting Ferguson, 2 S.W.3d at 917). To be constitutionally material, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. (footnote omitted) (citing Ferguson, 2 S.W.3d at 915, 918). If the proof establishes the existence of a duty to preserve and further shows that the State has failed in that duty, the trial court must consider the following factors to determine whether a trial without the missing evidence would be fundamentally fair: (1) the degree of negligence implicated, (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available, and (3) the sufficiency of the other evidence used at trial to support the conviction. Id. (citing Ferguson, 2 S.W.3d at 917).

Here, the record clearly shows that the State was never in possession of the aforementioned audio recording. Significantly, "the State is not required to investigate cases in any particular way[.]" State v. Brock, 327 S.W.3d 645, 698 (Tenn. Crim. App.

- 14 -

2009) (reiterating that "[d]ue process does not require the police to conduct a particular type of investigation" and that "the reliability of the evidence gathered by the police is tested in the crucible of a trial at which the defendant receives due process" (citation and internal quotation marks omitted). Regarding the first materiality prong, that the evidence must potentially possess exculpatory value, we note that the Defendant merely theorizes that the unidentified neighbor's audio recording of the incident was exculpatory. See State v. Ronnie D. Sims, No. M2004-02491-CCAR3-CD, 2005 WL 3132441, at *8, (Tenn. Crim. App. Sept. 21, 2005) ("[T]he mere possibility of exculpatory content does not trigger a finding that the State failed in its general duty to preserve evidence under Ferguson."). As to the second materiality prong, that the alleged exculpatory evidence be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable available means, the Defendant has failed to show that the audio recording was of such a nature that he would be unable to obtain comparable evidence, especially in light of Ryan Croft's video recordings, which contained both audio and video of the incident. Because the audio recording is not constitutionally material under Ferguson, the State had no duty to collect this evidence, and the trial court did not abuse its discretion in denying the Defendant's motion for mistrial.

**III. Election of Offenses.** The Defendant contends that the trial court committed plain error in not requiring the State to make an election of offenses with regard to the especially aggravated kidnapping count. He asserts that incident can be broken into two different episodes, namely what happened before the shooting and what happened after the shooting, and either could constitute an independent basis for the especially aggravated kidnapping charge. The State counters that no election of offenses was required because the Defendant captured the victim, forced her into the vehicle, shot her, and drove her around in a single, continuing course of conduct. We conclude that the trial court did not commit plain error when it failed to require the State to make an election.

Here, the Defendant admits that he failed to request that the State make an election of offenses and acknowledges that this issue will be reviewed for plain error. The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). "Plain error" review is also available when counsel fails to make a contemporaneous objection when an issue first arises. State v. Clayton, 535 S.W.3d 829, 847 (Tenn. 2017) (citing State v. Thomas, 158 S.W.3d 361, 413 (Tenn. 2005)). "To rise to the level of plain error, [a]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding." Id. (alteration in original) (citations and internal quotation marks omitted). In order for this court to find plain error,

- 15 -

"(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting Adkisson, 899 S.W.2d at 641-42).

Criminal defendants have a constitutional right to a jury trial, which necessarily includes the right to a unanimous jury verdict before a conviction may be imposed. State v. Lemacks, 996 S.W.2d 166, 169-70 (Tenn. 1999). "[W]here the prosecution presents evidence to the jury that tends to show more than one criminal offense, but the underlying indictment is not specific as to the offense for which the accused is being tried," the trial court has an affirmative duty to require the State to elect the particular offense it is submitting for the jury's consideration. Id. at 170 (emphasis added). However, in State v. Adams, the Tennessee Supreme Court outlined the situations in which an election of offenses is unnecessary:

When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises. To this end, this Court has made a distinction between multiple discrete acts that individually constitute separate substantive offenses and those offenses that punish a single, continuing course of conduct. In cases when the charged offense consists of a discrete act and proof is introduced of a series of acts, the state will be required to make an election. In cases when the nature of the charged offense is meant to punish a continuing course of conduct, however, election of offenses is not required because the offense is, by definition, a single offense.

24 S.W.3d 289, 294 (Tenn. 2000) (emphasis added).

It is well established that the offense of especially aggravated kidnapping is meant to punish a continuing course of conduct. State v. Jimmy Lee Whitmire, No. M2007-01389-CCA-R3-CD, 2009 WL 2486178, at *17 (Tenn. Crim. App. Aug. 13, 2009); State v. Antonio Dewayne Carpenter, No. W2001-00580-CCA-R3-CD, 2002 WL 1482799, at *7 (Tenn. Crim. App. Feb. 12, 2002); see State v. Legg, 9 S.W.3d 111, 117 (Tenn. 117). Moreover, the Defendant's indictment specifically charged him with especially aggravated kidnapping accomplished with a deadly weapon, and the corresponding jury instruction reflected this means of committing the offense. Clearly, no election of offenses was required in this case. Because no clear and unequivocal rule of law was breached and

- 16 -

consideration of the error is "not necessary to do substantial justice," the Defendant is not entitled to plain error relief.

**IV. <u>Sufficiency of the Evidence.</u>** Lastly, the Defendant maintains that the evidence is insufficient to sustain his convictions for attempted second degree murder and especially aggravated kidnapping. The State counters that it presented overwhelming evidence that the Defendant forced the victim into the car at gunpoint, knew that by shooting her a close-range he would be reasonably certain to cause her death, and then held the victim, who was heavily bleeding, against her will as the police chased him. We conclude that the evidence is more than sufficient to support the Defendant's convictions for attempted second degree murder and especially aggravated kidnapping.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009) (citing <u>State v. Evans</u>, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>State v. Wagner</u>, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)); <u>see</u> Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. <u>State v. Davis</u>, 354 S.W.3d 718, 729 (Tenn. 2011) (citing <u>State v. Majors</u>, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. <u>State v. Sutton</u>, 166 S.W.3d 686, 691 (Tenn. 2005); <u>State v. Hall</u>, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting <u>Hanson</u>, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. <u>State v. Campbell</u>, 245 S.W.3d 331, 335 (Tenn. 2008) (citing <u>Byrge v. State</u>, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. <u>Dorantes</u>, 331 S.W.3d at 379 (citing <u>State v. Rice</u>, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." <u>Wagner</u>, 382 S.W.3d at 297 (citing <u>State v.</u>

Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

**A. Attempted Second Degree Murder.** The Defendant argues that the evidence is insufficient to sustain his conviction for attempted second degree murder because the proof fails to establish that he intended to kill the victim. He claims that the proof shows only that he shot the victim one time in a non-vital area because she was reaching for her own firearm and then attempted to get her medical care. The Defendant asserts that no reasonable jury could conclude that his conduct constituted an attempted "knowing killing of another" pursuant to Code section 39-13-202(a)(1).

Second degree murder is defined as "[a] knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1). Second degree murder is a result-of-conduct offense because the statute "'focuses purely on the result and punishes an actor who knowingly causes another's death.'" State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010) (quoting State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000)). To prevail on a charge of attempted second degree murder, the State was required to prove that the Defendant acted with the intent to knowingly kill the victim and took a substantial step toward doing so. Tenn. Code Ann. § 39-12-101(a)(3). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Whether a defendant acts knowingly in killing another is a question of fact for the jury. Brown, 311 S.W.3d at 432 (citing State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000)). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." Id. § 39-12-101(b). The jury may infer intent from the character of the assault, the nature of the act, and from all of the circumstances of the case in evidence. Inlow, 52 S.W.3d at 105 (citing State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

Viewed in the light most favorable to the State, the evidence shows that the Defendant appeared at the victim's apartment complex unannounced and that just as the victim was backing out of her parking space, he opened her car door and threatened to kill her while brandishing a gun. Although the victim attempted to escape, the Defendant caught her, took her cell phone, and shot her, with the bullet striking her knee. The Defendant then dragged the victim by her clothes and her hair to her vehicle, forced her into the passenger seat, and as she opened her glove compartment to retrieve her gun to defend herself, the Defendant shot her in the right shoulder at close range before he getting into the driver's seat of the victim's car and driving away with. Thereafter, the Defendant drove at a high rate of speed, repeatedly telling her that she was going to die and that it was her fault that she had gotten shot. The victim begged the Defendant to take her to the hospital, but when they entered the hospital parking lot, the Defendant saw a police officer and refused to let her out of the car and then led the police on a chase down the interstate before the Defendant ultimately ran out of gas on an exit ramp and attempted to flee from

the officers on foot. The Defendant asserts that the victim's attempt to grab her gun and his later attempt to seek medical attention on the victim's behalf entitle him to relief because no reasonable jury could find that he attempted to kill the victim. However, the jury, by its verdict, chose to accredit the State's overwhelming proof of the Defendant's guilt over the Defendant's testimony. See Campbell, 245 S.W.3d at 335; Dorantes, 331 S.W.3d at 379; see also Brown, 311 S.W.3d at 432; Inlow, 52 S.W.3d at 104-05. Given the evidence presented at trial, a rational jury could have found that the Defendant acted with the intent to commit the knowing killing of the victim and that his conduct, both in shooting the victim at close range and in failing to obtain medical attention for her, constituted a substantial step toward that end.

**B. Especially Aggravated Kidnapping.** The Defendant also maintains that the evidence is insufficient to sustain his conviction for especially aggravated kidnapping because he did not force the victim into the vehicle at gunpoint and because he only drove away with the victim in order to obtain medical care for her. He claims that there is no proof that the victim wanted to get out of the car or that the Defendant prevented her from doing so.

Especially aggravated kidnapping, as relevant in this case, is defined as false imprisonment "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-305(a)(1) (2006). "A person commits . . . false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a). "When jurors are called upon to determine whether the State has proven beyond a reasonable doubt the elements of . . . especially aggravated kidnapping, trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." State v. White, 362 S.W.3d 559, 578 (Tenn. 2012). Factors to consider when determining whether there is substantial interference of the victim's liberty include "the nature and duration of the victim's removal or confinement by the defendant"; "whether the removal or confinement occurred during the commission of the separate offense"; "whether the interference with the victim's liberty was inherent in the nature of the separate offense"; "whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so"; "whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective"; and "whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." Id. at 580-81.

- 19 -

The evidence, viewed in the light most favorable to the State, established that Defendant opened the victim's car door and threatened to kill her while displaying a gun. When the victim ran to escape, the Defendant caught her, took her cell phone away from her, and shot her in the knee. The Defendant then dragged the victim by her clothes and her hair to her vehicle and then forced her into the passenger seat. When the victim opened her glove compartment to retrieve her gun to defend herself, the Defendant shot her in the right shoulder at close range before getting into the driver's seat of the victim's car and driving away. This gunshot wound caused the victim to lose a substantial amount of blood, to have difficulty breathing, and to immobilize her, which prevented her from escaping. The Defendant repeatedly told the victim she was going to die and agreed to take her to a hospital only after she agreed to get back together with him. However, when the Defendant saw an officer in the hospital's parking lot, he told her that she would not be going to the hospital, told her not jump out of the car, and engaged in a full scale police chase while telling the victim that she needed to "get ready to die" because he "wasn't going to jail." The Defendant's removal and confinement of the victim, which spanned 8.7 miles, prevented the victim from summoning assistance and greatly reduced the Defendant's risk of detection. See id. at 580-81. Although the Defendant contends that no rational jury could have found that he forced the victim at gunpoint into the vehicle in light of his testimony at trial that the victim voluntarily got into the vehicle to retrieve her keys and to return his belongings to him, the jury clearly rejected this claim. See Campbell, 245 S.W.3d at 335; Dorantes, 331 S.W.3d at 379. Moreover, while the Defendant argues that no rational jury could have determined that he held the victim against her will in light of the proof that he was attempting to take her to the hospital and his testimony that the victim never wanted to get out of the car and that he never prevented her from doing so, we decline the Defendant's entreaties for us to reweigh the evidence. See Wagner, 382 S.W.3d at 297. The victim's testimony and Croft's video recording of the incident overwhelmingly established that the Defendant knowingly and unlawfully removed and confined the victim so as to substantially interfere with her liberty, that the Defendant accomplished this with a deadly weapon, and that this removal and confinement was not incidental to the attempted second degree murder and firearm offenses. Accordingly, the Defendant is not entitled to relief.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE